**Judy LIEBERMAN, Plaintiff-Appellant,**

v.

**The UNIVERSITY OF CHICAGO, et al., Defendants-Appellees.**

No. 80–2549.

United States Court of Appeals, Seventh Circuit.

Argued May 1, 1981.

Decided Sept. 23, 1981.

Rehearing and Rehearing En Banc Denied Nov. 23, 1981.

George M. Strickler, Jr., Ann Woolhandler, Michael G. Collins, New Orleans, La., for plaintiff-appellant.

Stuart Bernstein, Mayer Brown Platt, Chicago, Ill., for defendants-appellees.

Before SWYGERT, Senior Circuit Judge, PELL, Circuit Judge, and CAMPBELL,* Senior District Judge.

WILLIAM J. CAMPBELL, Senior District Judge.

Plaintiff, Judy Lieberman, filed this lawsuit against the University of Chicago, its medical school (The Pritzker School of Medicine), the Dean of Students of the Division of Biological Sciences, and the Medical School Admissions Committee, claiming that she was denied admission to the medical school as a result of sexual discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).[1] In her complaint, plaintiff sought declaratory and injunctive relief as well as compensatory and punitive damages. Defendants' answer admits that the University of Chicago and its medical school receive federal financial assistance, but denies the allegations of discrimination.

Plaintiff had applied for admission to the 1977 entering class at the Pritzker School of Medicine. At that time she lived in Oak Park, Illinois with her husband and desired to remain in the Chicago area. Although placed on the "waiting list" at Pritzker, she was never offered admission and eventually accepted a place in the 1977 entering class at Harvard Medical School.[2] The plaintiff seeks compensatory damages for, inter alia, her moving expenses, pain and suffering, and loss of consortium.

The defendants moved for and obtained summary judgment. The District Court concluded that, based on the plaintiff's admitted intention to complete her medical education at Harvard, the request for injunctive relief was moot. The plaintiff does not attack that decision on appeal. However, the court also determined that the prayer for declaratory relief was moot, and that, as a matter of law, Title IX does not provide a damage remedy. The plaintiff appeals both of those decisions.

The issue of whether Title IX provides a damages remedy is conceded by the parties to be a question of first impression. The District Court based its decision on Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), (hereafter Cannon I) and both sides argue that case as compelling support for their positions. In Cannon I, the court held that Title IX contains an implied private right of action for an individual injured by a violation of 20 U.S.C. § 1681(a), and found injunctive relief appropriate. The question whether the plaintiff was entitled to damages was not addressed.[3] The Supreme Court has stated that:

the question whether a litigant has a "cause of action" is analytically distinct and prior to the question of what relief, if

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. The complaint originally included a claim under 42 U.S.C. § 1983, but that claim was subsequently dismissed on plaintiff's motion.

2. Plaintiff was offered admission to Harvard, the joint Harvard-MIT program, Albert Einstein, Northwestern University, Rush-Presbyterian-St. Luke's, and the University of Illinois. New York University, Cornell, and the University of Pennsylvania rejected her application. The University of Chicago and Yale placed her on the waiting list, although she eventually withdrew her application to Yale.

3. The only mention of damages in Cannon I is a tangential reference in footnote 10, see footnote 7, infra.

any, a litigant may be entitled to receive.[4] *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979).

Therefore, while *Cannon* I is certainly an important source of guidance for the issue before this court, we do not perceive it as dispositive of the question presented.

The exhaustive analysis of the legislative history of Title IX contained in *Cannon* I provides a foundation for our inquiry here. The legislation had two objects, to avoid the use of federal funds to support discrimination and to provide individual citizens effective protection against such practices, *Cannon* I, 99 S.Ct. at 1961. Title IX was intended by Congress to be interpreted and applied as Title VI, upon which it was modeled,[5] *Cannon* I, 99 S.Ct. at 1957. Based on that premise this Court recently held, after a thorough analysis, that § 1681(a) only prohibits intentional discriminatory acts, *Cannon v. University of Chicago*, 648 F.2d 1104 (7th Cir., 1981) (hereafter *Cannon* II).

Our analysis of Title IX proceeds with the observation that it was part of a bill designed to assist institutions of higher education adjust to a situation of "acute financial distress," 2 U.S.Code Cong. & Admin. News 1972, pp. 2462, 2463. The legislation increased federal funding of higher education, both public and private, by expanding existing programs and initiating others, *Ibid.* Thus, Title IX, as an integral part of this legislative scheme,[6] must be deemed an exercise of Congress' Spending Power, that is, the imposition of the statutory prohibition is justified by the expenditure of federal funds, see *Cannon* I, 99 S.Ct. at 1963.

In *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), the Court provided guidelines for construing implied rights and remedies in the context of funding legislation:

> . . . . [L]egislation enacted pursuant to the Spending Power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the Spending Power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." [citations omitted] 101 S.Ct. at 1539.

In order to ensure a "meeting of the minds," the conditions to be imposed by Congress must be stated in unambiguous terms. For that reason, the Court in *Pennhurst* declined to impose certain obligations on the defendants (and create concomitant

---

**4.** While the Supreme Court has made it clear that the issue of an implied remedy is distinct from the issue of an implied cause of action, guidance beyond that point is conflicting. It is agreed that the analysis required is one of statutory construction, however, there is authority that where a statute expressly provides a particular remedy it is improper to imply the existence of other remedies, *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979) citing *inter alia*, *Botany Mills v. United States*, 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379 (1929); *Securities Protection Investment Corp. v. Barbour*, 421 U.S. 412, 419, 95 S.Ct. 1733, 1738, 44 L.Ed.2d 263 (1975); while on the other hand the Court has stated that "the existence of a statutory right implies the existence of all necessary and appropriate remedies," *Transamerica*, 100 S.Ct. at 252, (White, J., dissenting) quoting *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969). We believe that the result in the case *sub judice* is mandated by the analysis

formulated in *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Therefore, we do not deem it necessary to attempt a resolution of the apparent inconsistency.

**5.** The issue as to whether damages are available under Title VI is currently unresolved, see *Guardian Association v. Civil Service Commission*, 633 F.2d 232 (2nd Cir. 1980).

**6.** The enactment of Title IX also amended certain provisions of The Civil Rights Act of 1964, 42 U.S.C. §§ 2000c and 2000h and the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 203 and 213, see, 1 U.S.Code Cong. & Admin.News 1972, p. 447. However, the plaintiff has not alleged a claim under any of those provisions. Therefore, we do not address them and our discussion of the Congressional intent and legislative history of Title IX is not intended to relate to those amendments.

rights to enforcement for the plaintiffs) despite suggestive language in the legislation. The Court buttressed its decision by noting that it would be inconsistent with the legislative intent of assisting the defendants to fund certain programs to impose additional financial obligations on them.

Both Title IX and its legislative history are silent as to the existence of a damage remedy for sexual discrimination. However, appellant argues that it is a small step from the implied private cause of action created in *Cannon* I to an implied remedy in damages. But the decision in *Cannon* I did not significantly alter the conditions upon which the recipients accepted federal funds. The injunctive relief authorized in *Cannon* I merely permits the courts to require the institutions to comply with one of the unambiguous terms of the agreement. While the Court did expand the class of plaintiffs who could enforce the "contract," the remedy created did not impose any additional burdens on the recipients of the funds.[7]

However, the implication of a damages remedy would impose a potentially massive financial liability upon the institutions whose "acute financial distress" triggered the legislation.[8] Theoretically, this liability could exceed the amount of the federal funds received. In any event, this potential liability would be a significant factor which the recipients would need to consider before it could be said that they had exercised their choice "knowingly, cognizant of the consequences of their participation," *Pennhurst*, 101 S.Ct. at 1540. Therefore, as a matter of statutory construction, we must assume that if Congress had intended to create a remedy for damages it would have done so explicitly.[9]

Appellant argues that the implication of a damages remedy would create an extremely effective means of enforcing § 1681. However, as noted previously, we do not perceive that remedy as entirely consistent with the legislative purpose. Furthermore, in light of the implied private cause of action for injunctive relief authorized by *Cannon* I, coupled with the provision for an award of attorneys' fees contained in 42 U.S.C. § 1988, aggrieved individuals have at least one effective means of enforcement. 20 U.S.C. § 1682 also provides means for federal administrative enforcement. Therefore, based upon the considerations discussed above, we consider it unwise to imply an additional remedy. If a damages remedy is to be created, it should be fashioned by Congress and not by the Courts, thus providing the institutions with ample notice and an opportunity to reconsider their acceptance of federal aid.[10]

As to the request for declaratory relief, we agree with the District Court that that issue is moot, see *Hansen v. Ahlgrimm*, 520 F.2d 768 (7th Cir. 1975).

---

**7.** The Court in *Cannon* I did refer to damages in a footnote quoting *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 40, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916):

"A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law . . ."

However, the legislation involved in that case, The Federal Safety Appliance Acts, was enacted pursuant to the Commerce Clause and subject to different considerations regarding the implication of a damages remedy. Therefore, we do not consider our decision herein to be inconsistent with that holding.

**8.** Appellant, who mitigated her damages to the extent that she accepted admission to another medical school of equal standing, seeks approximately $350,000.

**9.** We decide this case solely as a matter of statutory construction and do not address the issue of the limitations on Congress' power to impose conditions on private parties or the States pursuant to the spending power, see *Pennhurst*, 100 S.Ct. at 1540, footnote 13.

**10.** Because we conclude that a damages remedy is not presently available under Title IX, we need not address appellees' argument that appellant is not entitled to damages because of her failure to mitigate them.

For the above-stated reasons, the judgment of the District Court is affirmed.

SWYGERT, Senior Circuit Judge, dissenting.

I respectfully dissent from a decision which only can be read as an evisceration of the ban against sex discrimination contained in Title IX.[1]

## I.

The analysis of the majority opinion rests on the Supreme Court's recent decision in *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Although *Pennhurst* is the linchpin of the majority's reasoning, the majority opinion fails to provide a description of the facts and issues in *Pennhurst.*

*Pennhurst* concerned the Developmentally Disabled Assistance and Bill of Rights Act (Act), 42 U.S.C. § 6000 *et seq.* The Act creates a federal-state grant program through which the federal government provides funding to states that choose to participate. The funding is to aid participating states in designing programs for the care and treatment of the developmentally disabled. As is true with such federal grant programs, states that choose to accept the federal funds must comply with the conditions of the Act.

At issue in *Pennhurst* was section 6010 of the Act, the "bill of rights" provision. Section 6010 provides for a right to treatment which is to maximize the developmental

potential of the individual and is to be provided in the setting least restrictive of the individual's liberty. In contrast to other sections of the Act, section 6010 does not specifically state that compliance with the provisions of that section is a condition for receipt of funding.

The court of appeals held that the provisions in section 6010 were conditions of receipt and that plaintiffs had standing to bring a private cause of action for the state's failure to comply with that section. The Supreme Court reversed, holding simply that section 6010 was not a condition of receipt of federal funding. The Court remanded for a determination of whether plaintiffs had an implied private cause of action under other provisions of the Act.

## II.

While the majority accurately characterizes the Court's reasoning in *Pennhurst,* it provides no analysis as to why the reasoning of *Pennhurst* must apply. The only clue we receive is that both Title IX and the Act in *Pennhurst* were passed pursuant to the spending power. This superficial similarity does exist. Yet the present case involves issues vastly different from those in *Pennhurst.*

The majority relies on the following language from *Pennhurst:*

... [L]egislation enacted pursuant to the Spending Power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally

---

1. A majority of a panel of the Second Circuit has ruled that an action for damages is available under Title VI. *Guardian's Ass'n of New York City v. Civil Serv. Comm'n,* 633 F.2d 232 (2d Cir. 1980). In *Cannon* the Supreme Court indicated that "Congress intended to create Title IX remedies comparable to those available under Title VI." 441 U.S. at 703, 99 S.Ct. at 1961. Thus, from *Guardian's Ass'n* it follows that compensatory relief is available under Title IX. The view in *Guardian's Ass'n,* that compensatory relief is available under Title VI, was set forth in the opinion of Coffrin, J. (sitting by designation) (concurring). 633 F.2d at 272. Although Judge Coffrin's opinion is a

concurring opinion, it was joined by Judge Kelleher (sitting by designation). The third member of the panel, Judge Meskill, concluded that no private right of action for compensatory relief existed under Title VI. The other two members of the panel concluded that while compensatory relief was available under Title VI, the absence of discriminatory intent precluded relief under Title VI. While the opinion of the two panel members may be considered dictum, there is authority in this circuit that it is not. *Alloy Int'l Co. v. Hoover-NSK Bearing Co., Inc.,* 635 F.2d 1222 (7th Cir. 1980) (not dictum if decision on issue reflects process of adjudication).

imposed conditions. The legitimacy of Congress' power to legislate under the Spending Power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract."

101 S.Ct. at 1539.

A careful reading of this passage in *Pennhurst* reveals that it simply is inapplicable to the present case. The Court in *Pennhurst* was not faced with implying a damage remedy nor even with implying a private cause of action. Rather, the Court had to decide whether the provisions contained in section 6010 were even a condition of receipt of federal funding. The Court made clear only the obvious—that in deciding whether to accept federal funding the state must be aware of its statutory obligations. A condition of receipt of funding must be made explicit. This has absolutely no bearing on the existence of a damage remedy or a private cause of action.

Indeed, the Court in *Pennhurst* explicitly stated the issue as

[W]hether Congress in § 6010 imposed an obligation on the States to spend state money to fund certain rights as a condition of receiving federal moneys under the Act or whether it spoke merely in precatory terms.

101 S.Ct. at 1540.[2] Also, the Court was careful to distinguish the possibility that an implied private cause of action may exist under other provisions of the Act. This issue was remanded to the court of appeals. 101 S.Ct. at 1545–46. *Cf. id.* at 1545 n.21 ("Because we conclude that § 6010 confers no substantive rights we need not reach the question whether there is a private cause of action under 42 U.S.C. § 1983 to enforce those rights."). *Pennhurst* concerned what obligations were imposed upon recipients of funds, not what consequences flow from a violation of statutory conditions. In the

present case it is not disputed that Title IX is a condition of a receipt of federal funding. Thus, the analysis in *Pennhurst* is simply irrelevant.

The majority's reasoning appears even weaker when analyzed in light of the Supreme Court's decision in *Cannon* which implied a private cause of action under Title IX. The majority reasons that Congress must explicitly provide for a damage remedy because it is a condition of the "contract" between the federal government and the receiving institution. This overlooks the obvious fact that the Supreme Court in *Cannon* determined that an *implied* private cause of action exists under Title IX. Thus, the majority concludes that Congress can, by implication, create a private cause of action on behalf of an individual, but that it must expressly provide for a damage remedy. Even if I were to accept the logic of such a proposition, it appears that the existence of the implied cause of action is the more important policy decision which Congress would have to make regarding the passage of a statute. Therefore, it seems somewhat curious to conclude that Congress need not be explicit in creating standing for a violation of a statute, but must explicitly provide for a damage remedy.

Also, the logic of the majority is hardly flawless. The majority reasons that Congress must expressly provide for a damage remedy. This cannot possibly be reconciled with the Supreme Court's determination in *Cannon* that Congress implicitly created a private cause of action. The majority would apparently have asked Congress to write in an express damage remedy for a private cause of action for which it did not expressly provide. Obviously, if the damage remedy is to be expressly provided, there must be an express provision for a private cause of action. Thus, the majority's analysis is internally inconsistent as

---

**2.** *See also* 101 S.Ct. at 1538 ("Did Congress intend in § 6010 to create enforceable rights and obligations?").

well as inconsistent with the Supreme Court's decision in *Cannon*.[3]

The only attempt that the majority makes to reconcile the *Cannon* decision with its reasoning is to state that *Cannon* did not alter the conditions upon which a recipient accepted federal funds. The injunctive relief merely permits courts to require that receiving institutions comply with the conditions of the agreement. This attempt to minimize the impact of the holding in *Cannon*, that a private cause of action exists, is patently unpersuasive. Prior to the Supreme Court's decision in *Cannon* it was not certain whether a receiving institution would have to defend actions brought by individuals under Title IX. This was not made clear until the *Cannon* decision. The majority downplays the effect of this "surprise" condition by concluding that it does not alter the conditions of receipt because at most the injunctive relief will require that the receiving institution comply with the explicit conditions of Title IX. This ignores several practicalities. First, the holding in *Cannon* imposes the unexpected burden on the recipient of hiring legal counsel and defending an action in court. The Court in *Cannon* explicitly recognized this in rejecting respondent's contention that defending individual Title IX actions would be costly. 441 U.S. at 709, 99 S.Ct. at 1964. Second, it ignores the potential monetary liability that a recipient may incur as a result of having to pay attorney's fees to prevailing parties. *See* 42 U.S.C. § 1988. Finally, it ignores the costs of complying with injunctive relief obtained by an individual. In sum, the majority's attempt to conclude that *Cannon* imposed no added conditions on a receiving institution is without support. *Cannon* imposed potential financial costs on a receiving institution which were unanticipated or unknown at the time funding was accepted.

The Supreme Court's decisions in *Cannon* and *Pennhurst* indicate that in cases involving federal funding statutes, there are three analytically distinguishable issues. As *Pennhurst* makes clear, the first issue is what *substantive* conditions Congress intended to impose on a recipient of funding. Those conditions, *Pennhurst* concludes, must be explicitly stated by Congress. The majority constantly refers to the implication of a damage remedy as a condition of receipt of funding. This is inaccurate and manifests a misunderstanding of the structure of federal funding and the availability of individual relief for violation of the statutes.

The second issue, whether an implied cause of action exists, is a separate inquiry. The Supreme Court made that clear in *Pennhurst* when it remanded to the court of

---

**3.** Of course, the majority may be stating that a private cause of action may be implied by Congress but that a damage remedy must be expressly created. Such a contention is without merit. The cases which have held that a *damage* remedy exists for an implied private cause of action are legion. *See, e. g., Superintendent of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n.9, 92 S.Ct. 165, 169 n.9, 30 L.Ed.2d 128 (1971) (damages available for implied private right of action under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5), *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 388, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970) (damages available in private right of action under § 14(a) of the Securities and Exchange Act of 1934 and Rule 14a–9). Although the majority makes no attempt to distinguish or discuss those cases the majority's analysis does not appear to be that Congress must always expressly provide for a damage remedy but only must so provide when a statute is passed under the spending power. Unfortunately, the majority does not state this as a guiding principle. Even if it were stated, however, it is a conclusion reached without reconciliation with the Supreme Court's opinion in *Cannon*. The majority attempts to distinguish *Cannon* on the basis that the receiving institutions would be financially harmed by the award of damages—which would be inconsistent with the funding purpose of Title IX. As noted above, the majority completely ignores the real purposes of Title IX—avoiding use of federal resources to support discriminatory practices and providing individual citizens protection against those practices. *Cannon*, 441 U.S. at 704, 99 S.Ct. at 1961. Nor is the majority persuasive in attempting to distinguish *Cannon* on the basis that implying a private cause of action is not a financial burden on the receiving institution. *See* discussion *infra*.

appeals the issue of whether an implied right of action exists under other statutory provisions. Resolution of that issue requires an analysis of the four factors set out in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Pennhurst*, 101 S.Ct. at 1548, 1557 (White, J., dissenting).

Finally, after determining what are the conditions of receipt of federal funding and whether an implied cause of action exists, the issue of available remedies must be decided. This issue, as is discussed below, is governed by *Bell v. Hood*, 327 U.S. 678, 685, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946).

The majority confuses these three analytically distinguishable issues. For resolution of the issue of remedy, the majority reverts to the *Pennhurst* "contract" analysis, apparently untroubled that *Cannon* resolved the implied cause of action issue without relying on the significance of the spending power or conditions of receipt of federal funding in its analysis.

### III.

A proper statement of the law is contained in the seminal decision of *Bell v. Hood*, 327 U.S. 678, 685, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946).

> [W]hen federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.

*See also Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239, 90 S.Ct. 400, 405, 24 L.Ed.2d 386 (1969). The majority's only discussion of this point is in a footnote where it observes that this line of authority is apparently inconsistent with the Supreme Court's recent decision in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). The majority concludes that there is no need to discuss *Bell v. Hood* or its progeny because it concludes that the analysis provided for in *Pennhurst* is the applicable approach. As discussed above, *Pennhurst* simply is inapplicable to determining the existence of a damage remedy. It is curious that the majority should embrace *Pennhurst*, while at the same time relegate over thirty years of well-established Supreme Court authority to a cursory discussion in a footnote. *Bell* and its progeny certainly provide the relevant analytical framework and cannot be brushed aside.

The principle of *Bell v. Hood* serves two very important purposes. First, and most significantly, it recognizes the unique role that federal courts play in enforcing federal rights [4]—whether those rights be generated by statute or by the Constitution. The majority opinion completely ignores this fundamental principle and, without explanation, concludes that *Pennhurst* supplants this established doctrine.

The principle of *Bell v. Hood* serves another purpose—it gives courts guidance in analyzing matters of remedies for violations of federal statutes. My concern with the majority opinion is that the analysis it utilizes is completely inapplicable to future cases. Courts in this circuit which must follow the opinion will be at a loss to understand the relationship between the majority opinion, *Cort v. Ash, Bell v. Hood*, and *Cannon*. By failing to reconcile its approach with these Supreme Court precedents, other courts will be forced to play a shell game in determining what mode of analysis governs the issue of remedy.

Of course, the need for some principled way of resolving future cases is of significance in every area of the law. It assumes even greater significance, however, when

4. For a discussion of the historical dynamics which led to the restructuring of the relationship between the individual, the state government, and the national government and the role federal courts were to play in the structure, see H. Hyman, A More Perfect Union (1973).

we are determining whether a damage remedy exists for an implied private cause of action. As *Cannon* makes clear, determination of whether a private cause of action exists is a matter of legislative intent. But as has been observed, this task of determining legislative intent more often takes the form of Congress delegating to the courts to decide whether an implied private cause of action exists. *Cannon*, 441 U.S. at 717–18, 99 S.Ct. at 1967 (Rehnquist, J., concurring). Quite candidly, the legislative intent analysis, as embodied in the four factors of *Cort v. Ash*, often provides little guidance for reaching certain results. The task of determining Congress' intent as to whether a damage remedy is to be part of the statutory scheme is an even more delphic task. Indeed, the task of distinguishing Congress' intent which led the Supreme Court in *Cannon* to conclude that an implied private cause of action exists under Title IX, from Congress' intent which in this case leads the majority to conclude that Congress did not intend to provide a damage remedy for violations of Title IX can best be analogized to the medieval practice of counting angels on the head of a pin. I do not possess the confidence of the majority in drawing such fine distinctions in analyzing the legislative history of Title IX.

Therefore, the principle of *Bell v. Hood* alleviates the tensions inherent in this separation of powers problem. It correctly recognizes that federal courts have the role of providing broad and flexible remedies for violations of federal statutory and constitutional rights and presumes that absent convincing legislative intent to the contrary the power is plenary.[5]

Nor does the Supreme Court's recent decision in *Transamerica Mortgage Advisors,*

*Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) change this conclusion, the result in that case being based on the unique statutory scheme contained in the Investment Advisors Act. In *Transamerica* plaintiffs sued under two sections of the Investment Advisors Act. Section 206 of the Act made certain activities illegal. Section 215 of the Act provided that a contract which is made in violation of the Act is void. Plaintiffs claimed that an implied cause of action for damages existed under both sections 206 and 215. The Court rejected this argument and held that plaintiffs' exclusive remedy was provided by the explicit terms of section 215—the contract could be voided. No damage remedy was available. The Court reasoned that where a statute expressly provides for a particular remedy a court should not read other remedies into the statute.

The statutory scheme in *Transamerica* differs significantly from Title IX. The decision in *Transamerica* rested on the explicit creation of a statutory remedy in one section which precluded the implicit creation of a damage remedy. Needless to say, Title IX does not have a parallel explicit statutory remedy.[6] Therefore, the reasoning of *Transamerica* is inapplicable to resolving the damage issue in this case.

The majority resists resolution of what it terms the "apparent inconsistency" between *Transamerica* and the principle of *Bell v. Hood*. This inconsistency may be "apparent" but is not real. To be sure, the principle of *Bell v. Hood* is a presumption and is not an absolute rule. In certain instances Congress may wish to alter the available remedies and may so provide.[7] This is exactly what *Transamerica* recognizes—the

---

5. For a general discussion of the respective roles of the federal courts and Congress in defining the scope of federal remedies see Tushnet, *Constitutional and Statutory Analyses in the Law of Federal Jurisdiction*, 25 U.C.L.A. L.Rev. 1301 (1978).

6. Indeed, in *Cannon* the Supreme Court explicitly rejected the contention that the cut-off provision in Title IX was the exclusive remedy

under the Act. *Cannon*, 441 U.S. at 704–05, 99 S.Ct. at 1961–62.

7. Of course, Congress' restriction of the remedies available for constitutional or statutory violations cannot infringe on constitutional rights. *Cf. United States v. Klein*, 80 U.S. 128 (13 Wall.) 20 L.Ed. 519 (1872) (statute which attempts to bind Supreme Court to certain decision in a case invades judicial function).

unique statutory scheme evinced a congressional intent to preclude a damage remedy. But the principle of *Bell v. Hood* should at least shift the burden to the party opposing the remedy to prove, by convincing evidence, that Congress chose not to provide a damage remedy.

In the present case, such convincing evidence has not been presented. The majority's only evidence is that the purpose of Title IX is to fund educational institutions which were in "acute financial distress." The majority concludes that to provide a damage remedy would be inconsistent with the purpose of the statute. The majority attempts to analyze the issue in terms of the legislative purpose but completely ignores the real purposes of Title IX. As stated in *Cannon*:

> Title IX ... sought to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices. Both of these purposes were repeatedly identified in the debates on the two statutes.

441 U.S. at 704, 99 S.Ct. at 1961. Conspicuous by its absence is any mention in *Cannon* of the legislative "purpose" relied on by the majority. Rather, as is made clear in the quotation above, the concern over discrimination dominated as the congressional purpose behind Title IX.

The majority concludes that the burden of paying damages would be inconsistent with the funding provisions of Title IX. Yet this very same cost argument in opposition to an implied private cause of action was explicitly rejected in *Cannon*. In *Cannon* it was argued that defending individual actions would be a costly burden on receiving institutions. The Court, in rejecting this argument concluded:

> [Respondents] argue that this kind of litigation is burdensome and inevitably will have an adverse effect on the independ-

ence of members of university committees.

This argument is not original to this litigation. It was forcefully advanced in both 1964 and 1972 by the congressional opponents of Title VI and Title IX, and squarely rejected by the congressional majorities that passed the two statutes. In short, respondents' principal contention is not a legal argument at all; it addresses a policy issue that Congress has already resolved.

.     .     .     .     .

[R]espondents have not come forward with any demonstration that Title VI litigation has been so *costly* or voluminous that either the academic community or the courts have been unduly burdened. 441 U.S. at 709, 99 S.Ct. at 1964 (emphasis added).

I, therefore, must disagree with both the result and reasoning of the majority. The result in the instant case can only be understood as a setback in Congress' attempt to ban sex discrimination. Yet more troubling than the result is the reasoning used by the majority. Its reliance on *Pennhurst* and requirement of an *explicit* creation of a damage remedy ignores the historical role that federal courts have played in enforcing federal rights since the post-Civil War era. This historical role is embodied in the principle of *Bell v. Hood*. The majority's unexplained retreat from this principle is disturbing.

Also, preclusion of a damage remedy will impair the enforcement of Title IX. In *Cannon*, the Supreme Court concluded that implication of a private right of action was "not only sensible but is also fully consistent with—and in some cases even necessary to—the orderly enforcement of the statute." 441 U.S. at 705–06, 99 S.Ct. at 1962–63. The most highly qualified individuals who have been discriminated against will undoubtedly forego admission into the defendant-institution and accept admission at another school. Considering the delays in-

herent in litigation many cases will become moot. Therefore, these exceptionally qualified individuals will be unavailable to enforce Title IX through private litigation. Enforcement of Title IX through private litigation will then be left to those individuals who have not been accepted at the defendant-institution and have not attended another institution. In those cases, the plaintiffs may have less outstanding qualifications, though still may be qualified. Thus, it may be more difficult for the plaintiff to prove that lack of qualifications is not in fact the actual reason for the rejection. Likewise, in rebutting plaintiff's evidence of discrimination, the defendant-institution would be able to cover up any discrimination by focusing on the lesser qualifications of the plaintiff. I would allow those who are best able to prove discrimination, i. e., the most highly qualified, to bring actions to enforce Title IX. Provision of a damage remedy will allow these actions to go forward.

Preclusion of a damage remedy, therefore, will impair the role that individual actions are to play in the enforcement of Title IX. Aside from this crippling of the enforcement of Title IX, however, I also believe that a wronged individual should not be left without a remedy.

> The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection.

> · · · · ·

> The government of the United States has been emphatically termed a government of laws and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right. If this obloquy is to be cast on the jurisprudence of our country, it must arise from the peculiar character of the case.

*Marbury v. Madison*, 5 U.S. 137, 1 Cranch 87, 2 L.Ed. 60 (1803). I find nothing in the "peculiar character" of this case to support the conclusion that Congress chose to retreat from this principle in passage of Title IX.

I would reverse the judgment of the district court.