917 F.2d 779
 59 USLW 2294, 63 Ed. Law Rep. 727, 31
Fed. R. Evid. Serv. 675
 Arlene PFEIFFER, a minor by her parent and natural guardian,
Delmont PFEIFFER, Appellant,
v.
MARION CENTER AREA SCHOOL DISTRICT, BOARD OF SCHOOL
DIRECTORS FOR the MARION CENTER AREA SCHOOL DISTRICT, Duane
Lingerfelter, John Pappal, Paul Morris, Ronald Glasser,
Emerson Aul, John Feid, Glenn Minick, Samuel Elkin, Richard
Clark, Theda Lightcap, Jane Smith, Judith Skubis, George
Krivonick, Robert L. Stewart, John Mallino, Robert Wilburn,
National Association of Secondary School and National Honor
Society, Appellees.
 No. 90-3064.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 17, 1990.
Decided Oct. 30, 1990.
Rehearing Denied Dec. 20, 1990.
 
 Ellen J. Vargyas (argued), Nat. Women's Law Center, Washington, D.C., for appellant.
 Martha H. Munsch (argued), Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellees.
 Before HIGGINBOTHAM, Chief Judge, and SCIRICA and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 The major question for decision in this appeal by an unsuccessful plaintiff in a gender discrimination case is whether, based on the testimony admitted into evidence, the district court erred in concluding that there was no violation of Title IX of the Education Amendments of 1972, 20 U.S.C. Secs. 1681, et seq., when Arlene Pfeiffer was dismissed as a member of a high school chapter of the National Honor Society. The district court found as a fact that she was dismissed because of premarital sexual activity and not because of gender discrimination. Applying the appropriate standard of review, we hold that the finding was not clearly erroneous and accordingly affirm this determination of the court.
 
 
 2
 We are troubled, however, with an evidentiary ruling that excluded the testimony of a male student member of the school's chapter of the National Honor Society. We remand, therefore, for the limited purpose of admitting the proffered testimony. We hold that this testimony has the potential of being relevant to whether there was discriminatory intent by members of the faculty council when they met on November 9, 1983, and unanimously voted by secret ballot to dismiss Pfeiffer from the high school chapter. By our action we do not suggest that the admission of this evidence would, in and of itself, produce a different result from that previously reached by the trial court. We hold merely that the district court in reaching a fresh decision should consider this evidence along with all the other evidence previously adduced.
 
 
 3
 Should the trial court find that the dismissal was not motivated by a discriminatory intent that violates Title IX, then it would be appropriate to enter again judgment for the appellees. Should liability be determined, however, we conclude that the district court should consider the possibility of compensatory damages.
 
 I.
 
 4
 Jurisdiction was proper in the trial court based on Title IX and 28 U.S.C. Sec. 1331. The district court had pendent jurisdiction over the state law claims. Jurisdiction on appeal is proper based on 28 U.S.C. Sec. 1291. Appeal was timely filed under Rule 4(a), F.R.A.P.
 
 
 5
 "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Rule 52(a), F.R.Civ.P.
 
 
 6
 Virtually every Court of Appeals has embraced, with varying degrees of fidelity, the notion that relevance decisions are discretionary and reviewable only for abuse of discretion. 22 C. Wright & K. Graham, Federal Practice and Procedure: Evidence Sec. 5166 n. 45 (Supp.1990) and cases cited therein. We have a rather unfortunate conflict, however, in panel decisions in this court. Thus, in Gagliardi v. Flint, 564 F.2d 112, 116 (3d Cir.1977), cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978) we applied the general rule: "The relevancy of the testimony was a matter within the trial court's discretion." Six years later, without a court in banc permitting a departure from this court's precedent, a divided panel with a visiting judge joining in the majority opinion, said: "Our review of a Rule 402 relevancy ruling is plenary." In re Japanese Electronic Products, 723 F.2d 238, 269 (3d Cir.1983), reversed on other grounds sub nom. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In dissent, Chief Judge Seitz, 723 F.2d 238, 269 n. 37, preferred to adhere to ruling case law, citing inter alia, Hamling v. United States, 418 U.S. 87, 124-25, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974) ("[I]n judicial trials, the whole tendency is to leave rulings as to the illuminating relevance of testimony largely to the discretion of the trial court that hears the evidence." NLRB v. Donnelly Co., 330 U.S. 219, 236, 67 S.Ct. 756, 765, 91 L.Ed. 854 (1947); Michelson v. United States, 335 U.S. 469, 480, 69 S.Ct. 213, 220, 93 L.Ed. 168 (1948); Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962).)
 
 
 7
 The standard set forth in In re Japanese Electronic Products was followed in Brobst v. Columbus Services Int'l, 824 F.2d 271, 274 (3d Cir.1987), cert. denied, 484 U.S. 1043, 108 S.Ct. 777, 98 L.Ed.2d 863 (1988). However, we are constrained to apply the precept announced in O. Hommel Co. v. Ferro, 659 F.2d 340, 354 (3d Cir.1981), cert. denied, 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982): "[A] panel of this court cannot overrule a prior panel precedent.... To the extent that [the later case] is inconsistent with [the earlier case, the later case] must be deemed without effect." Accordingly, we must return to the general rule reflected in Gagliardi v. Flint, that relevance decisions are discretionary and reviewable only for abuse of discretion. The contrary statement announced in In re Japanese Electronic Products and repeated in Brobst is deemed without effect.
 
 
 8
 The standard of review in cases of statutory construction is plenary. Chrysler Credit Corp. v. First Nat'l Bank & Trust Co., 746 F.2d 200, 202 (3d Cir.1984).
 
 II.
 
 9
 The appellant, Arlene Pfeiffer, was a member of the class of 1984 at the Marion Center Area High School in Marion, Indiana County, Pennsylvania. She was a good student who earned high grades and participated in a wide variety of school organizations, including serving as president of the student council. Based on her record, she was elected to her high school's chapter of the National Honor Society (NHS) in 1981. The society had a local chapter in existence at the school from approximately 1975 until 1986. The local chapter was governed by a faculty council composed of Robert L. Stewart, the principal of the high school, and Theda Lightcap, Jane Smith, Judith Skubis, and George Krivonick, all teachers at the Marion Center Area High School.
 
 
 10
 During the spring of 1983, Pfeiffer, who was unmarried, discovered that she was pregnant. She informed her school guidance counselor and principal and indicated that she wanted to rear her child but that she also wanted to finish high school. Principal Stewart told her that he saw no problem in her plan to continue school and graduate.
 
 
 11
 The handbook for the National Honor Society requires that students be selected for membership on the basis of scholarship, service, leadership and character. The constitution of the local chapter followed that of the national organization, requiring admission and maintenance be based on the same qualities. The high school had a selection procedure which followed the national organization's instructions, in which these qualities were assessed by teachers. To be admitted into the NHS, a student was rated by at least five teachers. In the instructions under the heading "Leadership" one of the qualities to be assessed was whether the student exerted the type of leadership which directly influences others for good conduct. Another quality to be assessed under the heading "Character" was whether the student upholds principles of morality and ethics.
 
 
 12
 Upon learning of Pfeiffer's pregnancy, Judith Skubis, a teacher and member of the faculty council, brought the matter to the attention of the other council members in the spring of 1983. That fall, when school resumed, the council scheduled a meeting for November 4, 1983, and Pfeiffer was invited to attend. The council members explained to her that her NHS membership was in question because premarital sex appeared to be contrary to the qualities of leadership and character essential for membership. When asked if her sexual activity leading to her pregnancy had been voluntary, the plaintiff answered in the affirmative. The council deferred further action.
 
 
 13
 On November 8, 1983, Pfeiffer's father, Delmont Pfeiffer, telephoned Principal Stewart requesting a prompt decision because an induction ceremony for seniors was scheduled for the next day and Arlene wanted to attend. The council met on the morning of November 9, 1983, and by secret ballot unanimously voted to dismiss her from the NHS chapter. By letter the council advised her:
 
 
 14
 By action of the faculty council, you have been dismissed from the National Honor Society for the following reason:
 
 
 15
 Failure to uphold the high standards of leadership and character required for admission and maintenance of membership.
 
 
 16
 It is the opinion of the faculty council that a member must consistently set a positive example for others and, as outlined in the selection guidelines, always uphold all of the high standards of moral conduct.
 
 
 17
 App. at 27.
 
 
 18
 On November 30, 1983, the council met with her parents, who requested that the subject be placed on the agenda of the school board meeting scheduled for December 12, 1983. Pfeiffer and her parents appeared at the meeting with counsel. The board requested that the matter be discussed privately, but Pfeiffer and her parents insisted that the issue be discussed publicly.
 
 
 19
 At the discussion, the board was asked to review the decision of the faculty council. On December 19, 1983, the board and the council met to consider the matter further and on January 16, 1984, the school board adopted a resolution unanimously affirming the action of the faculty council.
 
 
 20
 After graduation from high school, with honors, Pfeiffer elected not to go to college and began working with the Holiday Inn of Indiana, where she is presently a sales manager. She is married, but not to the father of the child conceived while she was in school.
 
 III.
 
 21
 Arlene Pfeiffer filed suit alleging discrimination in her dismissal from the local chapter of the NHS, seeking an injunction that she be reinstated in the chapter, that the records of the school district be corrected to show that she remains in good standing in the society, that a procedure for dismissal be ordered that is not discriminatory, that the NHS be prohibited from disseminating information about her dismissal and that she be awarded compensatory and punitive damages.
 
 
 22
 Injunctive relief and damages were requested under Title IX of the Education Amendments of 1972, 20 U.S.C. Secs. 1681, et seq., and its implementing regulations. The complaint included claims of gender discrimination pursuant to 42 U.S.C. Secs. 1983 and 1985 and included state law claims under the Pennsylvania Human Relations Act (PHRA), 43 P.S. 955(i)(1) (Purdon's Supp.1988), and the Pennsylvania Equal Rights Amendment, Commonwealth Constitution art. 1, Sec. 28.
 
 
 23
 In addition to the Marion Center Area School District, the appellant named in her complaint the Board of School Directors and the individual members of the Board in their individual capacities. She also named members of the Faculty Council of the NHS chapter and John Mallino, Superintendent of the School District.
 
 IV.
 
 24
 At the onset of the case, the question arose whether Title IX applied because the School District did not receive federal funds for the operation of its chapter of the NHS, while it did receive federal funds for its school lunch program. Under the holding of Grove City College v. Bell, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), the district court denied Pfeiffer her Title IX claim. While the case was pending, Congress passed the Civil Rights Restoration Act of 1987, part of which amended Title IX to circumvent the Supreme Court's decision in Grove City. By an Opinion and Order of August 17, 1989, the district court ruled that the Restoration Act made the School District subject to Title IX, but that Pfeiffer's constitutional claims were subsumed within the Title IX claim. In addition, the court held that the state law claims would be considered during trial.
 
 
 25
 During a bench trial, the court heard testimony that the school district keeps no records of a student's extracurricular activities and that there are no records therefore concerning Pfeiffer's induction or absence thereof, or of her membership in the NHS. The NHS no longer exists at Marion Center Area High School and the national organization is no longer a party to this suit.
 
 
 26
 Testimony was presented that a pregnant female student had resigned from the NHS chapter after an admission of engaging in premarital sex 10 to 12 years earlier. She apparently had been given the choice of resignation or dismissal by the faculty council. No male member of the chapter has ever been dismissed for premarital sexual activity. The appellant offered to introduce testimony by a former student who was a male member of the chapter, that two years after Pfeiffer's dismissal, while a senior at the high school he impregnated his girlfriend and that he was not dismissed from the chapter. The district court excluded the evidence.
 
 
 27
 After considering the admitted evidence, the district court made a factual finding that the plaintiff was not dismissed for her pregnancy but because the faculty council concluded that she had failed to uphold the standards of the National Honor Society by engaging in premarital sexual intercourse.
 
 V.
 
 28
 Title IX of the Education Amendment of 1972 provides, in part, as follows:
 
 
 29
 No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.
 
 
 30
 20 U.S.C. Sec. 1681(a). Regulations promulgated pursuant to Title IX specifically apply its prohibition against gender discrimination to discrimination on the basis of pregnancy, parental status, and marital status. Pursuant to 34 C.F.R. Sec. 106.40 (1980),
 
 
 31
 A recipient shall not apply any rule concerning a student's actual or potential parental, family, or marital status which treats students differently on the basis of sex.
 
 
 32
 . . . . .
 
 
 33
 (b)(1) A recipient shall not discriminate against any student or exclude any student from its education program or activity, including any class or extracurricular activity, on the basis of such student's pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom unless the student requests voluntarily to participate in a separate portion of the program or activity of the recipient.
 
 
 34
 The district court held that the faculty council and the school board did not violate Title IX or the regulations because the plaintiff was not dismissed from the NHS because of her pregnancy but because the faculty council considered premarital sex as setting an example inconsistent with the objectives and standards of the Honor Society. The district court held specifically that
 
 
 35
 [t]he plaintiff was not dismissed for her pregnancy but because the council thought she had failed to uphold the standards already discussed as evidenced by plaintiff's Exhibit 1 (the letter directed to her) and plaintiff's Exhibit 3 (the resolution of the School Board dated January 16, 1984.)
 
 
 36
 Memorandum Opinion at 8-9; App. at 603-04. This is a finding of fact, and it may not be disturbed unless clearly erroneous.
 
 VI.
 
 37
 In Wort v. Vierling, No. 82-3169, slip op. (C.D.Ill. Sept. 4, 1984), aff'd on other grounds, 778 F.2d 1233 (7th Cir.1985), the court held that a school district's dismissal of a pregnant student from the National Honor Society was a violation both of Title IX and the equal protection clause of the fourteenth amendment. In Wort, the court concluded that "[p]laintiff was dismissed from the NHS because of her pregnancy or the acts leading up to her pregnancy." Id., slip. op. at 4.
 
 
 38
 In reaching that decision, the court in Wort declined to distinguish the sexual conduct from the resulting pregnancy. But the district court here did make this distinction. It specifically found that Pfeiffer was dismissed not because she was pregnant but because she had engaged in premarital sexual activity. This is an important distinction between the two cases. Regulation of conduct of unmarried high school student members is within the realm of authority of the National Honor Society given its emphasis on leadership and character.
 
 
 39
 In any event, the appellant's entire argument before us rests upon her allegation that she was dismissed from the chapter because of her condition of pregnancy. Unfortunately for her theory, however, the district court found that
 
 
 40
 The plaintiff was not dismissed for her pregnancy but because the council thought she had failed to uphold the standards already discussed as evidenced by Plaintiff's Exhibit 1 (the letter directed to her) and Plaintiff's Exhibit 3 (the resolution of the School Board dated January 16, 1984.)
 
 
 41
 Memorandum Opinion at 8-9; App. at 603-04. As a finding of fact, this holding may not be disturbed unless clearly erroneous. We do not believe that it is erroneous. Supporting this finding is the stated reason given by the council for her dismissal: Failure to uphold the standards of leadership and character required for admission and maintenance of membership. App. at 27. Moreover, the finding is supported by the testimony of the faculty council members before the district court, each of whom testified at trial. See App. at 415, 417, 427-28, 455 (Skubis); 472 (Stewart); 510 (Lightcap); 528 (Smith); 541-42 (Krivonick). Each faculty council member specifically denied that his or her dismissal vote was based anywhere on Pfeiffer's sex, on her pregnancy, or on her failure to marry after she had engaged in premarital sexual activity.
 
 
 42
 This factual finding is bolstered by the district court's reasoning that
 
 
 43
 [f]aced with the task of educating hundreds of young people, and with constant demand by the public that the schools instill attributes of good character as part of the educational process, the Council and the Board can scarcely be criticized for taking the action which was taken.
 
 
 44
 Memorandum Opinion at 9; App. at 604. Indeed, the Supreme Court has given us express guidance in matters relating to student conduct in public schools:
 
 
 45
 The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order. Consciously or otherwise, teachers--and indeed the older students--demonstrate the appropriate form of ... conduct and deportment in and out of class. Inescapably, like parents, they are role models. The schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct....
 
 
 46
 Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 683, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986).
 
 VII.
 
 47
 More difficult, however, is appellant's contention that the district court abused its discretion in excluding the proffered testimony of a former student, a male member of the Marion Center Area High School chapter of the NHS. At trial, the following colloquy took place:
 
 
 48
 THE COURT: Do you want to make an offer?
 
 
 49
 MR. RUBIN: Yes, your Honor. What we intend to prove with [the proffered testimony] is that he was in fact a student in the Marion Center Area High School and was a member of the National Honor Society in the same year that Arlene was a senior.
 
 
 50
 He was a sophomore and was also a member during that year and was knowledgeable as to the events regarding Arlene's dismissal. Further we would like to offer that, during his senior year two years later, with the same faculty council sitting on the National Honor Society, that he in fact got married, had a child, shortly thereafter getting married, and he had informed his teacher and other members of the Marion Center community that he was the father and that he got married because his fiance had gotten pregnant.
 
 
 51
 Additionally, we would be able to show through evidence that a document of the Marion Center Area School District called biographies has two entries into it showing that this boy was known generally in the high school community by the nickname daddy, and that he made the comment at his 15th year reunion he will be able to celebrate his wedding anniversary and child's birth.
 
 
 52
 The point of putting this individual on is that he can testify that nobody ever approached him about his conduct with regard to premarital sexual activity, that nobody ever approached him from the National Honor Society concerning this.
 
 
 53
 There is evidence through depositions that they have stated on numerous occasions if they were aware of any situation dealing with a male, that they would in fact consider that in the same light that they had considered Arlene.
 
 
 54
 Trial Transcript at 87-88; App. at 346-47.
 
 
 55
 We find this evidence can possibly be relevant to the state of mind of the faculty council on November 3, 1983, and whether the council and the board's explanation for their actions was pretextual when they dismissed Pfeiffer. The proffered testimony is relevant to the issue of intentional discrimination at the time Pfeiffer was dismissed. We, therefore, disagree with the district court's exclusion of it on the grounds that the events in the proffer post-dated by some years the November 1983 action of the council.
 
 
 56
 Although the proffer was not as precise as it could have been, and recognizing that Pfeiffer's counsel did not indicate with specificity how the later events were relevant to the activities of November 1983, we believe that the evidence has the potential of being relevant to whether the council members followed a double standard in evaluating premarital sexual activities of NHS chapter members. Under these circumstances, to exclude it was not consistent with sound exercise of discretion.
 
 
 57
 However, in directing that this testimony be considered, we are not saying that the proffer was sufficient. For example, all the proffer said was that the male student "had informed his teacher and other members of the Marion Center community that he was the father and that he had got married because his fiance had gotten pregnant." App. at 346-47. There is nothing in the proffer declaring that any member of the council had any knowledge of this situation.
 
 
 58
 What is important to the ultimate determination is what information was communicated to the council members. Lacking such communication, the testimony may not even be relevant. Moreover, even if the district court finds that the council did know of the male student's premarital sexual activity and did nothing about it, this by itself does not require the district court to make automatic findings one way or another. By remanding, we only instruct the district court to consider the proffered testimony for what it may be worth.
 
 VIII.
 
 59
 If no relief were available to Pfeiffer here, it would be pointless to remand to the district court. An exercise to find liability without finding a remedy would be an exercise in futility. Accordingly, it becomes necessary for us to determine what relief would be available in the event that the district court determines that Pfeiffer establishes liability.
 
 
 60
 We conclude that the claim for injunctive relief is moot: There is no local organizational activity or action for the court to enjoin and the national organization is no longer a defendant in this suit. Courts do not adjudicate moot cases and will not hear a case when the object sought is not obtainable. Mills v. Green, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895). A central concern in determining mootness is "whether all or part of the relief requested by the complaining party is effectively available." Wilmington Firefighters Local 1590 v. City of Wilmington, 824 F.2d 262, 265 (3d Cir.1987). The National Honor Society chapter has been disbanded at Marion Center Area High School, and no records are kept as to the appellant's or any student's membership, lack of membership, or expulsion from the NHS. Moreover, the National Honor Society, itself, was dismissed as a party defendant by agreement of the parties.
 
 A.
 
 61
 There is also a serious question as to what monetary damages, if any, could be available to the appellant, should the district court determine that she was discriminated against in violation of Title IX. Her dismissal from the NHS did not affect her status or record as a student. She graduated with honors and with her class. She did not apply for, or lose, any collegiate scholarships or awards because of her dismissal from the NHS. She elected not to attend college for reasons having nothing to do with her dismissal and was not denied a job because she was dismissed from the NHS. To the extent that Pfeiffer's dismissal became public knowledge, that knowledge resulted from her own actions and those of her parents, including appearances on several national and local television programs. She has admitted that she knows of no one who holds her in disrepute because of her dismissal from the NHS. Memorandum Opinion at 6-8; App. at 801-03.
 
 B.
 
 62
 Assuming, without deciding, that some monetary damages could be calculated, however, it becomes necessary to meet the vexing problem of whether monetary damages are available for breach of Title IX. The district court concluded that Pfeiffer was not entitled to compensatory damages under Title IX because victims of discrimination are entitled to declaratory and injunctive relief alone. It relied upon the reasoning of the Court of Appeals for the Seventh Circuit in Cannon v. University of Health Sciences/The Chicago Medical School, 710 F.2d 351 (7th Cir.1983); Lieberman v. University of Chicago, 660 F.2d 1185 (7th Cir.1981), cert. denied, 456 U.S. 937, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982), and Bougher v. University of Pittsburgh, 713 F.Supp. 139 (W.D.Pa.), aff'd on other grounds, 882 F.2d 74 (3d Cir.1989). See Bougher, 713 F.Supp. at 143 n. 2.
 
 
 63
 In Lieberman, the court concluded that Title IX did not impliedly provide a damage remedy to alleged victims of sexual discrimination. Relying on the legislative history, the court stated, "we consider it unwise to imply an additional remedy. If a damages remedy is to be created, it should be fashioned by Congress and not by the Courts, thus providing the institutions with ample notice and an opportunity to reconsider their acceptance of federal aid." Id. at 1188 (footnote omitted). In so doing, the court recognized the apparent conflict between theories of statutory construction and the Supreme Court's holding in Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). See also Cannon v. University of Health Sciences/The Chicago Medical School, 710 F.2d 351 (7th Cir.1983).
 
 
 64
 In Cannon v. University of Chicago, the Supreme Court held that Title IX contains an implied right of action for an individual injured by reason of a violation of that statutory section. The availability of a damage remedy was not analyzed although the Court referred to an injured party's common law entitlement to damages. The Court quoted its earliest "inference of a private right of action" in Texas & Pacific Ry. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916):
 
 
 65
 A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law expressed in 1 Com. Dig., ... This is but an application of the maxim, Ubi jus ibi remedium. See 3 Black. Com. 51, 123; Couch v. Steel, 3 El. & Bl. 402, 411; 23 L.J.Q.B. 121, 125. 241 U.S., at 39-40 [36 S.Ct. at 484].
 
 
 66
 441 U.S. at 689 n. 10, 99 S.Ct. at 1953 n. 10.
 
 
 67
 Ultimately two theories of statutory construction oppose each other in this inquiry. On one side exists the principle that when a statute expressly provides a particular remedy, it is improper to imply the existence of other remedies. Lieberman, 660 F.2d at 1187 n. 4 (citing Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979)); see Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 13-15, 101 S.Ct. 2615, 2622-23, 69 L.Ed.2d 435 (1981). On the other side is the precept that the existence of a statutory right implies the existence of all necessary and appropriate remedies. Lieberman, 660 F.2d at 1187 n. 4 (citation omitted); see also Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946) ("where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief"); Beehler v. Jeffes, 664 F.Supp. 931, 939 n. 12 (M.D.Pa.1986).
 
 
 68
 In Cannon, the Supreme Court indicated that Congress intended to create remedies in Title IX comparable to those available under Title VI. We thus look to guidance from the Supreme Court in cases involving Title IX and its statutory predecessor, Title VI. In Guardians Ass'n v. Civil Service Comm'n of N.Y. City, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), a majority of the Court found that compensatory relief based on past violations of conditions regulating use of federal funds is available for Title VI violations when intentional discrimination is present. Id. at 602-03, 103 S.Ct. at 3232-33; see also 463 U.S. at 606-07, 103 S.Ct. at 3234-35 (White, J., announcing judgment of the Court, joined by Rehnquist, J.); id. at 610-11, 103 S.Ct. at 3237 (Powell, J., concurring, joined by Burger, C.J., and Rehnquist J.); id. at 615, 103 S.Ct. at 3238 (O'Connor, J., concurring). Tracking this analysis to a Title IX claim, we now conclude, not without some difficulty, that compensatory relief is available for certain Title IX violations and that this is one of them.
 
 C.
 
 69
 We recognize that our decision here puts us in conflict with the Courts of Appeals of both the Seventh and Eleventh Circuits. See Franklin v. Gwinnett County Pub. Schools, 911 F.2d 617 (11th Cir.1990) (compensatory damages are not recoverable under either Title VI or Title IX based on Fifth Circuit precedent); Cannon v. University of Health Sciences/The Chicago Medical School, 710 F.2d 351 (7th Cir.1983) (case law precluded claim for damages under Title IX); Lieberman v. University of Chicago, 660 F.2d 1185 (7th Cir.1981) (damages unavailable under Title IX), cert. denied, 456 U.S. 937, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). However, we believe that it is to the Supreme Court that we must look for guidance, and our reading of Guardians Ass'n, supra, and its progeny, persuades us that Title IX includes a remedy of compensatory damages. In so doing, we follow the analysis of Judge Lord in Haffer v. Temple Univ., 678 F.Supp. 517 (E.D.Pa.1987) and Chief Judge Nealon in Beehler v. Jeffes, 664 F.Supp. 931 (M.D.Pa.1986).
 
 D.
 
 70
 Neither the Supreme Court nor this court has decided specifically whether intent is a necessary element of a Title IX claim. However, recognizing that "Title IX was patterned after Title VI of the Civil Rights Act of 1964," Grove City College v. Bell, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), we believe that the standard adopted for Title VI actions in Guardians Ass'n should be required in Title IX cases. In so doing, we admit that we would have been more comfortable had the personal philosophical observations of the several justices in Guardians Ass'n been distilled somehow to offer, if not clear guidance, at least some guidance as to the quantum of proof required.
 
 
 71
 In Guardians, the "threshold issue before the Court [was] whether ... private plaintiffs ... need to prove discriminatory intent to establish a violation of Title VI ... and administrative implementing regulations promulgated thereunder." Id. 463 U.S. at 584, 103 S.Ct. at 3223. A majority of the Court agreed that a violation of the statute itself requires proof of discriminatory intent. A different majority seemed to suggest that proof of discriminatory effect suffices to establish liability when suit is brought to enforce the regulations rather than the statute itself. See id. at 607 n. 27, 103 S.Ct. at 3235 n. 27 (opinion of White, J.); id. at 608 n. 1, 103 S.Ct. at 3235 n. 1 (opinion of Powell, J., concurring). However, Justice White, in a final footnote, concluded that "no compensatory relief should be awarded if discriminatory animus is not shown." Id. at 607 n. 27, 103 S.Ct. at 3235 n. 27 (opinion of White, J.).
 
 
 72
 In any event, we need not meet this problem because the gravamen of Pfeiffer's complaint is that she was intentionally discriminated against in violation of Title IX and its implementing regulations. This is, therefore, not a case of discriminatory effect, but one of discriminatory intention. In her complaint she alleged that the defendants "conspired to deprive [her] of her constitutional rights." Complaint at 11; App. at 20. Because an intentional violation has been alleged, we find it unnecessary to enter into the quagmire created by the Supreme Court's fragmented opinions in Guardians Ass'n. See, e.g., Haffer v. Temple Univ., 678 F.Supp. 517, 540 (E.D.Pa.1987) ("plaintiffs need not prove discriminatory intent to succeed on their claim"); Beehler, 664 F.Supp. at 940 (award of money damages appropriate in private suit involving intentional discrimination). We find it sufficient to allow a remedy of compensatory damages when a plaintiff alleges and then establishes discriminatory intent.
 
 IX.
 
 73
 Appellant also appeals the district court's failure to reach her constitutional claims. The district court held that her constitutional claims were "subsumed" by Title IX and otherwise barred by the doctrine in Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). In Sea Clammers, the Court held: "[W]hen 'a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under Sec. 1983.' " 453 U.S. at 20, 101 S.Ct. at 2626 (quoting Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 673 n. 2, 99 S.Ct. 1905, 1945 n. 2, 60 L.Ed.2d 508 (1979) (Stewart, J., dissenting)).
 
 
 74
 The Sea Clammers doctrine has been applied consistently in analogous cases. See, e.g., Smith v. Robinson, 468 U.S. 992, 1011-12, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984) (Education of the Handicapped Act, 20 U.S.C. Secs. 1400, et seq., with its comprehensive enforcement scheme, precluded the plaintiffs' claim of handicap discrimination in violation of the equal protection clause); Zombro v. Baltimore City Police Dep't, 868 F.2d 1364, 1366-67 (4th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 147, 107 L.Ed.2d 106 (1989) (plaintiff could not maintain action for age discrimination under 42 U.S.C. Sec. 1983 because claim fell within the scope of the Age Discrimination in Employment Act, 29 U.S.C. Secs. 621, et seq.); Bougher v. University of Pittsburgh, 713 F.Supp. 139, 145 (W.D.Pa.) (under Sea Clammers, plaintiff could not maintain an action claiming an equal protection violation under 42 U.S.C. Sec. 1983 alleging gender discrimination under Title IX), aff'd on other grounds, 882 F.2d 74 (3d Cir.1989); Ring v. Crisp County Hosp. Auth., 652 F.Supp. 477, 482 (M.D.Ga.1987) (rejecting plaintiff's equal protection claim under Sec. 1983, holding that the ADEA was exclusive remedy for claims of age discrimination, whether those claims are founded on the Constitution or on rights created by the ADEA); Mabry v. State Bd. for Community Colleges and Occupational Educ., 597 F.Supp. 1235, 1239 (D.Colo.1984) (Title IX's enforcement scheme is sufficiently comprehensive to preclude Sec. 1983 claims), aff'd on other grounds, 813 F.2d 311 (10th Cir.), cert. denied, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987).
 
 X.
 
 75
 Pfeiffer also has asserted a violation of the Pennsylvania Equal Rights Amendment ("ERA"). Should the district court conclude that no violation of Title IX exists, then Pfeiffer's Pennsylvania ERA claim could, in the discretion of the district court, be dismissed for lack of federal jurisdiction. Rosado v. Wyman, 397 U.S. 397, 402-05, 90 S.Ct. 1207, 1212-14, 25 L.Ed.2d 442 (1970); Lentino v. Fringe Emp. Plans, Inc., 611 F.2d 474 (3d Cir.1979); Hauptmann v. Wilentz, 570 F.Supp. 351 (D.N.J.1983), aff'd, 770 F.2d 1070 (3d Cir.1985), cert. denied, 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986); see also, 13B C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction 2d Sec. 3567.1, at 133-37 (1984). Otherwise, the district court may have to meet the question whether, if damages are available under Title IX, duplicative damages also may be available under the state ERA. We are of the view that a private right of action is available for cases of gender discrimination under the Pennsylvania ERA. Bartholomew on Behalf of Bartholomew v. Foster, 115 Pa.Commw. 430, 541 A.2d 393 (1988), aff'd, 522 Pa. 489, 563 A.2d 1390 (1989); Welsch v. Aetna Ins. Co., 343 Pa.Super. 169, 494 A.2d 409 (1985).
 
 XI.
 
 76
 The judgment of the district court will be affirmed in part and vacated and remanded in part.