ALDISERT, Circuit Judge,
dissenting.
As I join in all respects the dissenting opinion of Judge Roth, I deem it necessary to add these observations regarding civil rights cases proceeding under 42 U.S.C. §§ 1983 and 1988. How a judge applies the Supreme Court’s decision in Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001), to this case depends on the judge’s philosophy of law, jurisprudence, and jurisprudential temperament, which inform the decision to come to grips with whether or not an action is “judicially sanctioned.” The Majority holds that the decisions of the trial judge on the record in this case did not qualify as “judicially sanctioned” actions. I am equally convinced that they did.
Before setting forth detailed support for my view, it is necessary to emphasize the specific holding or decision of the Court in Buckhannon because it is the decision, and not the reasoning, that forms the precedent. The expression stare decisis is but an abbreviation of stare decisis et non quieta movere (to stand by or adhere to decisions and not disturb that which is settled). “Decisis” means, literally and legally, “the decision.” The doctrine is not “stare dictis ” (“to stand by or keep to what was said”). Nor is the doctrine stare rationibus decidendi (“to keep to the reasoning of past cases”). Rather, a case is important for what it decides: for “the what,” not “the why,” and not “the how.” Thus, stare decisis means what the court did, not what it said.
The Court in Buckhannon stated: “we hold that the ‘catalyst theory’ is not a permissible basis for the award of attorney’s fees under the [Fair Housing Amendments Act of 1988, or the Americans with Disabilities Act. of 1990].” 532 U.S. at 610, 121 S.Ct. 1835. Earlier, the Court had explained that attorney fees should not be awarded pursuant to the catalyst theory because that theory “allows an award where there is no judicially sanctioned change in the legal relationship of the parties.” Id. at 605, 121 S.Ct. 1835. Thus, the issue for decision in this case is whether there was such judicially sanctioned change.
Today the Majority makes clear that the Supreme Court has not precluded the possibility that a “judicially sanctioned” change may include events other than a judgment on the merits or a consent decree:
As noted, the Supreme Court has identified two formal resolutions that make a winning attorney eligible for a fee award: (1) enforceable judgments on the merits, and (2) court-ordered consent decrees. Buckhannon, 532 U.S. at 604, 121 S.Ct. 1835. Buckhannon characterized these two resolutions as “examples” of decisions that create the necessary material alteration of the legal relationship of the parties. Id. at 604-05, 121 S.Ct. 1835. There may be resolutions other than the two identified in Buck *241 hannon that warrant prevailing party status (although the Supreme Court has yet to identify any).
Maj. Op. at 231. To hold as does the Majority that “[bjeeause no enforceable judgment on the merits was issued in this case, and the State’s actions that mooted the case were voluntary, Buckhannon tells us that Live Gold was not a prevailing party,” Maj. Op. at 232, is to apply a philosophy of jurisprudence no longer in general acceptance — conceptual jurisprudence, a philosophy that preaches that a principle, if sound, ought to be applied wherever it logically leads, without reference to ulterior results — and wholly inappropriate for cases that touch upon civil rights.
Without a nod to the effects on future civil rights cases, the Majority fashioned a major stumbling block to success for civil rights plaintiffs in cases based on § 1983. The plaintiff here was: (1) victorious on the merits in obtaining a temporary restraining order, duly recorded and altering the position of the parties, and (2) able to persuade the District Court at the preliminary injunction hearing that formal registration of their mark was unnecessary. That the District Court told the plaintiff, “in effect [you’ve] won the case,” shows that Live Gold was, in effect, the prevailing party on the merits.
I.
I am proud of this Court’s civil rights history from as far back as 1939, when this Court upheld First and Fourth Amendments rights in Hague v. Committee of Industrial Organization, 101 F.2d 774 (3d Cir.1939), affd and modified, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Introducing his opinion for our Court, Judge Biggs wrote: “The question presented by the appeal at bar is whether or not certain fundamental civil liberties safeguarded by the Constitution of the United States shall be observed and protected in Jersey City or shall there stand abridged.” Id. at 777. Thus, more than 20 years before the resuscitation of 42 U.S.C. § 1983 in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), this Court was in the business of expanding, not contracting, civil rights protections.[1] Until today. Until a Majori *242 ty of this Court embarked on a jurisprudential adventure that makes it unnecessarily difficult for civil rights plaintiffs who seek to enforce federal rights and statutes. The Majority does so by erecting roadblocks before plaintiffs who seek to qualify as a “prevailing party” under § 1988.
The Majority employs a stingy interpretation of “judicially sanctioned,” declaring that there was no act of sanctioning notwithstanding that: (1) the District Court entered a Temporary Restraining Order based on the merits, and (2) in the subsequent preliminary injunction hearing the District Court told the defendant that it completely agreed with the plaintiff, (3) the defendant conceded that the State of New Jersey would be bound by the District Court’s interpretation of the trademark, (4) the plaintiff moved for entry of summary judgment in its favor, and (5) the District Court declared entry of summary judgment was unnecessary because, “I just don’t know what else there is to address ... in effect, [Live Gold] has won the case.”
The Majority nonetheless contends that although Live Gold won the case, the win was not “judicially sanctioned” because the District Court did not enter on the record five words: “Plaintiffs summary judgment motion granted,” or four words “Judgment ordered for plaintiff.”
The Majority nonetheless contends that although the District Court told the parties that the plaintiff won the case, the win was not “judicially sanctioned” because the District Court did not formally enter its decision on the record. The Majority’s interpretation of “judicially sanctioned” is reminiscent of the writ-based common law pleading rules, which were so inflexible that a plaintiff that used the wrong writ was out of court. It was a system “that had become rigid and rarified” and a system in which “a party could easily lose on technical rules.”[2] I therefore disagree with my colleagues of the Majority who believe Buckhannon prohibits us from determining that the plaintiff was a prevailing party. That case does not establish technical rules that prohibit us from acknowledging that the plaintiff was the prevailing party. Let’s face it. It’s not that Buckhannon prohibits us. It’s a matter of choice. The Majority simply chooses to not extend its holding to different facts and precepts involving attorney fees in civil rights actions. I prefer to follow the history of this Court in expanding holdings in civil rights cases in new and fresh fact patterns. In so doing, I adhere to what our Court has been doing since 1939, and *243 we carry forward the pioneer efforts of American jurisprudents from as early as the end of the Nineteenth Century.
II.
The distance between the Majority and the dissent in this case can be traced through more than one hundred years of American legal history. As early as 1897, American courts were being chided for undue reliance on theoretical concepts. This was the philosophy behind European attempts to establish codes in every country on the continent. German Professor Rudolf von Ihering pioneered the work of replacing the European jurisprudence of conceptions with a jurisprudence based upon results. Our own thinkers, across the Atlantic Ocean, followed suit. In The Path of the Law in 1897 Oliver Wendell Holmes, Jr. gently admonished:
I think that the judges themselves have failed adequately to recognize their duty of weighing considerations of social advantage. The duty is inevitable, and the result of the often proclaimed judicial aversion to deal with such considerations is simply to leave the very ground and foundation of judgments inarticulate, and often unconscious ... [3]
By 1906, Dean Roscoe Pound of Harvard Law School was trumpeting the same theme. He described our system as conceptual jurisprudence, a slavish adherence to elegantia juris, the symmetry of law, and suggested that we resembled too much the rigid German BegHffsjurisprudenz.[4] This led him to call upon the American Bar Association to put an end to mechanical jurisprudence: “The most important and most constant cause of dissatisfaction with all law at all times is to be found in the necessarily mechanical operation of legal rules.”[5]
In 1921, Benjamin N. Cardozo delivered the Storrs lectures at Yale, stating: “The final cause of law is the welfare of society. The rule that misses its aim cannot permanently justify its existence.”[6] The same year, he seized the opportunity to put his new theory into practice by publicly rejecting blind conceptual jurisprudence. See Hynes v. N.Y. Cent. R.R., 231 N.Y. 229, 131 N.E. 898 (1921).
These thinkers led us out of the methodology of conceptual jurisprudence — the view that a legal precept should be followed to its dryly logical extreme, regardless of its effects on society. If Pound’s 1908 warning against mechanical decision making did not create a new American school of jurisprudence, it at least spawned widespread respectability for social utilitarianism. It added a new dimension to law’s traditional objectives of consistency, certainty and predictability — a concern for society’s welfare, elegantly described by Professor Harry W. Jones as a legal rule that “contributes to the establishment and preservation of a social environment in which the quality of human life can be spirited, improving and unimpaired.”[7] In all but a few areas of static law, mechanical jurisprudence has become more historical than operational, except for what the Majority does in this case.
*244 III.
I turn now to legal philosophy, jurisprudence and jurisprudential temperament, because part of what divides the Majority and the dissent is a difference in views of these concepts.[8] When I speak of legal philosophy, I am addressing a very broad inquiry into what the relationship between individuals and their government, ought to be. In this context, the problems of legal philosophy are problems of normative political philosophy. So perceived, legal philosophy inquires into the problems of terminology, legal methods, the role of precedent, statutory interpretation, underlying rationale, the use of different types of authority, the efficacy of various controls and their operation in diverse factual scenarios, and the basic issues concerning the values that are implemented.
When I speak of a legal philosophy, I am addressing the specific answers to these basic inquiries forthcoming from very respectable thinkers, both in academia and on the bench. Each thinker probably articulates or at least demonstrates some particular legal philosophy. Hence, each of their individual solutions to myriad problems of judicial decision making is what I call a legal philosophy.
How a judge interprets the concept of “judicially sanctioned” depends on the legal philosophy the judge chooses to espouse. It cannot be seriously debated that the Majority’s refusal to grant attorney fees in this case will limit future civil rights actions, discouraging the Congressional intent to provide attorney fees to civil rights plaintiffs under § 1988. It will discourage settlements, prolong litigation, and make work for overburdened district judges. Defendants will use complications in petitions for § 1988 attorney fees as bargaining tools in negotiations for calculating damages. Members of the Majority arrive at their decision by adhering to a philosophy of conceptual jurisprudence, an approach to the law that extends a legal precept to a drily logical extreme, regardless of the results upon society, and a philosophy that has found rejection in our courts for almost 100 years.
I turn now to the concept of jurisprudence. I perceive it as separate and apart from legal philosophy, in that it includes obligatory norms, both substantive and procedural, that shape and regulate the life of a people. This concept of jurisprudence more or less takes the form of an aggregate of legal precepts, a sort of bylaws of a given society or rules that govern a given social order. It is law as it is, not as it ought to be. It is more properly a juridical science than a philosophy. Yet jurisprudence may also be considered “a body of traditional ideas as to how legal precepts should be interpreted and applied and causes decided, and a traditional technique of developing and applying legal precepts whereby these precepts are eked out, extended, restricted, and adapted to the exigencies of administration of justice.” [9]
I find it necessary to distinguish between legal philosophy and jurisprudence. If a judge is truly following “a body of traditional ideas,” he or she is probably observing the law as it “is” and not as it “ought to be.” If we talk about law as it should be, we have entered the world of legal philosophy and philosophical generalities. Immanuel Kant suggested that the distinction existed in two simple Latin words. When we ask “quid jus ?” we are *245 seeking some general principle of philosophy to help us decide what the law ought to be. When we ask “quid juris ?” we are seeking what already has been established as part of the jurisprudence.[10]
Unfortunately, the line between what the law is and what it ought to be is not always a bright one. As this case shows, one legal precept, pushed to the limit of its logic with inadequate consideration of the results, may point to one conclusion; another precept, followed with equal logic but emphasis on the results, may point with equal certainty to another conclusion. Or take the questions posed by Cardozo:
If a precedent is applicable, when do I refuse to follow it? If no precedent is applicable, how do I reach the rule that will make a precedent for the future? If I am seeking logical consistency, the symmetry of the legal structure, how far shall I seek it? At what point shall the quest be halted by some discrepant custom, by some consideration of the social welfare, by my own or the common standards of justice and morals? [11]
It is here where that quality I call jurisprudential temperament, or the judge’s intuition, comes into play. Temperament invariably influences the decision because it inclines the decision maker one way or another.[12] It is a major determinant in the case at bar in deciding the best interpretation of “judicial sanctioned.”
If, as in eases like this one, the result is not predetermined and the law is not clear, the courts are faced with what Professor H.L.A. Hart called the “penumbral” issues, where the language of the legislation or a particular putative precedent of a court is general.[13] Whether a judge attempts to clarify a penumbral area of the law reflects a value judgment, and is indicative of the judge’s jurisprudential temperament. Some judges have lower thresholds than others, and are more inclined to find solace in shades and fringes rather than the black-letter law. When this problem occurs, as is the circumstance of this divided Court, Professor Ronald Dworkin suggests that the decision depends “on the judge’s own preferences among a sea of respectable extralegal standards, any one in principle eligible, because if that were the case we could not say that any rules were binding.” [14]
The extent to which a court adheres to the legal precepts attached to the facts in Buckhannon rather than those present in the galaxy of our civil rights cases that have extended plaintiffs’ rights, is not just a matter of logical analysis. In dealing with a putative precedent the judge’s function goes beyond a perception of what was really intended; he or she exercises a choice. In the case at bar, it is a choice between: (a) conceptual jurisprudence, which preaches that a principle ought to be applied wherever it logically leads, without reference to results; or (b) a jurisprudence of results, which preaches “the establishment and preservation of a social environment in which the quality of human life can be spirited, improving and unim *246 paired.”[15] Justice Walter V. Schaefer taught us:
[M]ost depends upon the judge’s unspoken notion as to the function of his court. If he views the role of the court as a passive one, he will be willing to delegate the responsibility for change.... If he views that court as an instrument of society designed to reflect in its decisions the morality of the community, he will be more likely to look precedent in the teeth and to measure it against the ideals and the aspiration of his time.[16]
* * sH * # *
Through the years, it is said that in this Court we have dissent without dissension. It is in this spirit that I have expressed, respectfully, a failure to agree with a large number of my colleagues without in the least inferring any diminution of my great respect for each of them. And so, as the Marine Corps Hymn says, it is at this “clime and place” that a difference in legal philosophy, jurisprudence and jurisprudential temperament is demonstrated in the divergence between the Majority and dissenting judges’ views upon applications for attorney fees under § 1988. That such a difference exists is not unusual; appellate courts are fashioned as multi-judge institutions so that different views may be publicly and forcibly expressed. What is unfortunate about the difference in this case, however, is the result that the Majority’s holding will impose upon future civil rights plaintiffs.

. See, e.g., Albright v. Oliver, 510 U.S. 266, 270 n. 4, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (identifying the Third Circuit as having ''[t]he most expansive approach” among the courts of appeals as to the extent to which a claim of malicious prosecution is actionable under § 1983 (citing Lee v. Mihalich, 847 F.2d 66, 70 (3d Cir.1988) (Becker, Hutchinson, Scirica))); Pfeiffer by Pfeiffer v. Marion Ctr. Area Sch. Dist, 917 F.2d 779, 788 (3d Cir.1990) (Higginbotham, Scirica, Aldisert) (diverging from other courts of appeals to hold that compensatory relief is available for certain Title IX violations), abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 129 S.Ct. 788, 172 L.Ed.2d 582 (2009); Meló v. Hafer, 912 F.2d 628, 635 (3d Cir.1990) (Sloviter; Becker, Stapleton) (holding that state officers sued in their individual capacities are "persons” for the purposes of § 1983), affd, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); E.E.O.C. V. Univ. of Pa., 850 F.2d 969 (3d Cir.1988) (Becker, Hutchinson, Scirica) (holding that under the circumstances and in light of the purposes of Title VII of the Civil Rights Act of 1964, the first-filed rule did not govern the case), affd, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990); AlKhazraji v. Saint Francis Coll., 784 F.2d 505, 514-517 (3d Cir.1986) (Adams, Gibbons, Stapleton ) (providing a broad definition of "race” under 42 U.S.C. § 1981), affd, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); Ricks v. Del. State Coll, 605 F.2d 710, 712 (3d Cir.1979) (Adams, Rosenn, Higginbotham) (identifying the “humanitarian and remedial purpose" of Title VII to hold that its limitations period does not run until termination of employment), rev’d, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); Goode v. Rizzo, 506 F.2d 542 (3d Cir.1974) (Staley, Gibbons, Weis) (upholding a district court’s finding that violations of constitutional *242 rights by Philadelphia police occurred in a high number of instances and allowing injunctive relief), rev'd, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); Hackett v. McGuire Bros., Inc., 445 F.2d 442, 446 (3d Cir.1971) (McLaughlin, Aldisert, Gibbons) (concluding that the phrase “by a person to be aggrieved” in Civil Rights Act of 1964 showed "a congressional intention to define standing as broadly as is permitted by Article III of the Constitution”), quoted approvingly by Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), abrogated by Thompson v. N. Am. Stainless, LP, - U.S. -, 131 S.Ct. 863, 869, 178 L.Ed.2d 694 (2011); Douglas v. City of Jeannette, 130 F.2d 652 (3d Cir.1942) (Biggs, Maris, Jones, Goodrich) (holding that federal courts have jurisdiction over alleged deprivations of constitutional rights pursuant to the Civil Rights Act of 1871), aff’d, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); Minersville Sch. Dist. v. Gobitis, 108 F.2d 683 (3d Cir.1939) (Biggs, Clark, Kalodner) (affirming an injunction against compulsory flag salutes in schools), rev’d, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940), overruled by W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628.(1943).

. Stephen N. Subrin, How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective, 135 U. Pa. L.Rev. 909, 917 (1987).

. Oliver W. Holmes, Jr., The Path of the Law, 10 Harv. L.Rev. 457, 467 (1897).

. Roscoe Pound, Mechanical Jurisprudence 608, 610 (1908).

. Roscoe Pound, The Causes of Popular Dissatisfaction with the Administration of Justice, Address Before the Am. Bar Ass'n (Aug. 29th 1906).

. Benjamin N. Cardozo. The Nature of the Judicial Process 66 (1921).

. Harry W. Jones, An Invitation to Jurisprudence, 74 Colum. L.Rev. 1023, 1030 (1974).

. Ruggero J. Aldisert, Philosophy, Jurisprudence, and Jurisprudential of Federal Judges, 20 Ind. L.Rev. 453 (1987).

. Roscoe Pound, The Theory of Judicial Decision, 36 Harv. L.Rev. 641, 645 (1923).

. Immanuel Kant, The Philosophy of Law 43-46 (Kelly ed. 1974) (Hastie trans. 1887).

. Cardozo, supra note 6.

. The key word is "jurisprudential,” not "judicial” temperament. The latter is descriptive of a judge’s personality while sitting on the bench during a trial or on appeal.

. H.L.A. Hart, The Concept of Law 121-122 (1961).

. Ronald Dworkin, Taking Rights Seriously 89-90 (1977).

. Jones, supra note 7.

. Walter V. Schaefer, Precedent and Policy, 34 U. Chi. L.Rev. 3, 23 (1966).